19MAG 7561

ORIGINAL

Approved: _____
SARAH MORTAZAVI
Assistant United States Attorney

Before: HONORABLE HENRY PITMAN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA       : SEALED COMPLAINT
                               :
      - v. -                   : Violations of 21 U.S.C.
                               : § 846
ANDREW PARKER,                 :
    a/k/a "Alex,"              : COUNTY OF OFFENSE:
                               : BRONX
            Defendant.         :
                               :

- - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

Mark A. Hadzewycz, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

COUNT ONE

1. In or about April 2019, in the Southern District of New York and elsewhere, ANDREW PARKER, a/k/a "Alex," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that ANDREW PARKER, a/k/a "Alex," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3.    The controlled substance that ANDREW PARKER, a/k/a "Alex," the defendant, conspired to distribute and possess with intent to distribute was one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

## COUNT TWO

4.    In or about April 2019, in the Southern District of New York and elsewhere, ANDREW PARKER, a/k/a "Alex," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

5.    It was a part and an object of the conspiracy that ANDREW PARKER, a/k/a "Alex," the defendant, and others known and unknown, would and did (i) possess a list I chemical with intent to manufacture a controlled substance, and (ii) possess and distribute a list I chemical knowing and having reasonable cause to believe that the list I chemical would be used to manufacture a controlled substance, in violation of Title 21, United States Code, Sections 841(c)(1) and (2).

6. The list I chemical that ANDREW PARKER, a/k/a "Alex," the defendant, conspired to possess with intent to manufacture a controlled substance, and to possess and distribute knowing and having reasonable cause to believe that it would be used to manufacture a controlled substance, was pseudoephedrine, its salts, optical isomers, and salts of optical isomers, in violation of Title 21, United States Code, Sections 841(c)(1) and (2), and 802(34).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

7. I am a Special Agent with the DEA. I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

8. Since at least in or about April 2019, the DEA has been investigating a Mexico-based drug trafficking organization ("DTO") that appears to be transporting narcotics to and from various locations and associates within the United States, including in and around New York City. In or about April 2019, DEA officers in Santo Domingo, Dominican Republic informed DEA officers in New York that a source of information was aware of a DTO member who traffics narcotics in the United States, including in or around the New York City area. DEA officers in Santo Domingo provided DEA officers in New York with a phone number belonging to an individual believed by law enforcement to be a member of the DTO ("Telephone-1"). The area code for the number indicated that it was a Mexican phone number. DEA officers in Santo Domingo also provided DEA officers in New York with a phone number of a second individual believed by law enforcement to be a member of the DTO ("Telephone-2"). Upon receiving this information, I enlisted a

3

particular confidential source ("CS-1")[1] to contact the user of Telephone-1 and the user of Telephone-2 for the purpose of setting up a controlled purchase of heroin.

        9. Based on my conversations with other DEA agents and CS-1, my participation in this investigation, and my review of law enforcement records and reports, I have learned, in substance and in part, the following:

        a. In or about April 2019, CS-1 contacted Telephone-1 to discuss arranging a heroin transaction with the user of Telephone-1 ("CC-1"). During several phone calls between CC-1 and CS-1 in or about April 2019, which were recorded,[2] CC-1 stated, in substance and in part, that he had large quantities of "material" and "work" that he wanted to sell, which were of poor quality. CC-1 stated, in substance and in part, that the material was a "brownish little powder" – which I know, through my training and experience, to be consistent with the appearance of heroin – and that he wanted to enlist CS-1's help in "fixing" the product, which I understand, based on my training, experience, and participation in this investigation, to be a reference to improving the quality of the narcotics. CS-1 stated, in substance and in part, that he would obtain a sample of the product in order to test its quality and determine if he could improve it. In this series of calls, CC-1 also agreed, in substance and in part, to put CS-1 in touch with another member of the DTO so that CS-1 could obtain a sample of the "work." Based on my training, experience, and participation in this investigation, I have learned that drug traffickers commonly use the terms "work" and "material" as code words to refer to narcotics, including heroin

        b. On or about April 12, 2019, CS-1 also contacted Telephone-2 to discuss with the user of Telephone-2 ("CC-2") arranging the heroin transaction that CS-1 had first

---

[1] CS-1 is providing information and proactive assistance to law enforcement in exchange for payment and the prospect of immigration benefits. CS-1 has previously provided information to law enforcement that has led to multiple arrests and convictions. Up to in or about October 2017, CS-1 had been providing assistance to law enforcement in exchange for leniency at sentencing in relation to criminal charges. Those criminal charges have since been resolved. Information provided by CS-1 to law enforcement has proven reliable and has been corroborated, in part, by independent evidence.

[2] Descriptions and quotations of recorded calls and meetings set forth herein, some of which occurred in Spanish, are based on my review of those recordings and preliminary draft translations, transcriptions, and summaries of the recordings, as well as my conversations with CS-1.

4

discussed with CC-1. CC-2 and CS-1 exchanged voice recordings during which they discussed, in substance and in part, CS-1 receiving a sample of the "work" from a friend of CC-2's.

c. Later that day, on or about April 12, 2019, CS-1 received a telephone call from another apparent DTO member, later identified, as explained below, as ANDREW PARKER, a/k/a "Alex," the defendant, using a particular phone number ("Telephone-3"). Based on my training, experience, and participation in this investigation, including the foregoing facts, I believe that PARKER had received CS-1's contact information from CC-2 for purposes of arranging the narcotics transaction discussed during CS-1's calls with CC-1 and CC-2.

d. Between on or about April 12, 2019 and on or about April 15, 2019, CS-1 exchanged text messages with PARKER at Telephone-3 relating to, in substance and in part, setting up an in-person meeting.

e. On or about April 15, 2019, CS-1 had a recorded phone call with PARKER using Telephone-3, during which PARKER, in substance and in part: identified himself as "Alex"; agreed to send a courier ("CC-3") to meet CS-1 in the Bronx, New York; and expressed his belief that the "work" (*i.e.*, narcotics) was "no good" and his hope that CS-1 could "fix" it.

f. Also on or about April 15, 2019, PARKER, using Telephone-3, sent CS-1 a number of text messages which, in substance and in part, confirmed the address for the meeting in the Bronx between CS-1 and CC-3 ("Address-1") and provided a description of the clothing CC-3 would be wearing. Later that day, CS-1 met CC-3 at Address-1, and the meeting was recorded. CC-3 was wearing clothing that matched the description of CC-3's clothing that PARKER had provided CS-1 prior to the meeting. Based on my surveillance of this meeting, my discussions with CS-1, and my review of an audio recording of the meeting, I learned that, during this meeting, CS-1 called Telephone-3 and stated to PARKER, in substance and in part, that CS-1 was currently at the meeting with "Alex's friend," *i.e.*, CC-3. I also learned that, at the meeting, CC-3 provided CS-1 with a plastic bag that contained approximately 11 grams of a beige rock-like substance. A sample of the substance was later tested by a DEA laboratory and found to contain pseudoephedrine hydrochloride. Through my training and experience, I know that pseudoephedrine hydrochloride is a salt form of pseudoephedrine, a "list I chemical" under Title 21, United States Code, Section

802(34), and is sometimes used by drug traffickers as a cutting agent to "cut" or intermix with narcotics.

10. Based on my conversations with other DEA agents and CS-1, my participation in this investigation, and my review of law enforcement records and reports, I have learned, in substance and in part, that:

a. On or about April 22, 2019, CS-1 contacted CC-2 at Telephone-2 to ask, in substance and in part, for fentanyl to help CS-1 "fix" the low-quality narcotics he had discussed previously with CC-1, CC-2, and ANDREW PARKER, a/k/a "Alex," the defendant. Through my training and experience, I have learned that heroin traffickers sometimes lace their heroin with fentanyl, which is substantially more potent than heroin, and that fentanyl is not commonly used to lace other controlled substances.

b. In or about May 2019, CS-1 exchanged voice messages and calls with CC-2 and another apparent member of the DTO ("CC-4"), discussing, in substance and in part, setting up a meeting with members of the DTO in Manhattan for May 24, 2019, for the purpose of having CS-1 collect approximately one kilogram of the low-quality heroin CS-1 was expected to "fix."

c. On or about May 24, 2019, based on instructions from CC-2 and CC-4, CS-1 met with CC-4, who provided CS-1 with approximately one kilogram of a particular substance. A sample of the substance was later tested by a DEA laboratory and found to contain pseudoephedrine hydrochloride and a small amount of fentanyl.

11. From my participation in physical surveillance and my review of geolocation data for Telephone-3 obtained pursuant to a judicially-authorized warrant, I have learned, in substance and in part, that on or about April 18 and 19, 2019, a particular vehicle with an identified license plate ("Vehicle-1") was frequently located in the same area as Telephone-3. For example, on or about April 18, 2019 at approximately 8:32 p.m., I observed Vehicle-1 parked in the driveway of a residence located at a particular address in Flushing, New York ("Flushing Address"). From my review of geolocation data for Telephone-3, I learned that Telephone-3 was located in the vicinity of the Flushing Address at that date and time.

a. From my review of publicly available information associated with the Flushing Address, I have learned

that the occupant of the Flushing Address is listed as "Andrew Parker." From my review of publicly available information, I have also learned that "Andy Parker" is listed as the owner and Chief Executive Officer for a company whose listed address is "411 Hempstead Tpke, West Hempstead, New York" (the "Office Address").

    b. From my review of records provided by Telephone-3's service provider, I have learned that the subscriber of Telephone-3 is listed as "John Doe" at address "311 Hempstead Tpke, Franklin Square, NY" (the "Subscriber Address") and that Telephone-3 has been active since on or about March 1, 2019. I have further learned that the Subscriber Address and the Office Address are approximately 300 meters apart.[3]

    c. From my review of geolocation data, I have learned that Telephone-3 has frequently been located in the vicinity of the Office Address. For example, on or about April 19 and 22, 2019, I observed an individual whom I recognized as ANDREW PARKER, a/k/a "Alex," the defendant, based on my review of a driver's license photograph of PARKER, at the Office Address. From my review of geolocation data, I know that Telephone-3 was located in the vicinity of the Office Address at the same time that I observed PARKER at the Office Address on the aforementioned dates.

    d. On or about April 23, 2019, while conducting physical surveillance of PARKER, I placed three phone calls to Telephone-3, which went unanswered. During each call, I observed PARKER check his phone without answering, further evidencing that the user of Telephone-3 is PARKER.

---

[3] From my review of publicly available information, I have learned that Franklin Square, New York is a hamlet within the town of Hempstead, New York. I have also learned that 311 Hempstead Turnpike is the street address of a coffee shop located in the hamlet of West Hempstead within the town of Hempstead, and that no comparable street address appears to exist in the hamlet of Franklin Square.

WHEREFORE, I respectfully request that ANDREW PARKER, a/k/a "Alex," the defendant, be arrested and imprisoned or bailed, as the case may be.

_____
Mark A. Hadzewycz
Special Agent
Drug Enforcement Administration

Sworn to before me this
13th day of August, 2019.

_____
HONORABLE HENRY PITMAN
United States Magistrate Judge
Southern District of New York