

# LaRusso, Conway & Bartling
### ATTORNEYS AT LAW

September 1, 2020

Hon. Sarah Netburn
United States Magistrate Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

        Re:    United States v. Andrew Parker
                 Criminal Docket No. 20-CR-0258(SN)

Dear Judge Netburn:

      Defendant Andrew Parker ("Andrew" or "Parker") respectfully submits this letter in connection with his up-coming sentencing scheduled for September 14, 2020. Based upon all the facts set forth below, it is respectfully requested that a sentence of one-year probation is both reasonable and warranted in this case[1].

### I.    BACKGROUND/GUIDELINE CALCULATIONS:

      On April 24, 2020, Mr. Parker pled guilty before this Court to a misdemeanor Information. The Information charged him with conspiring with others to possess heroin, in violation of Title 21, U.S.C. Section 846 and 8441(a). The plea was the subject of an agreed upon plea agreement between the parties. The Pre-Sentence Report ("PSR") tracks the plea agreement and finds the total adjusted offense level as a level 6. Mr. Parker does have a prior offense and as such he is in a criminal history level II. Based upon a total offense level of 6, the total advisory guideline range is 1-7 months. Both parties have no objections to the PSR calculations. Since his arrest just over one year ago, Parker has been monitored by Pre-Trial Services and has been fully compliant with all his obligations.

      After a total review of all the factors herein, we respectfully submit that a sentence of one-year Probation is reasonable and appropriate.

---

[1] We note and thank the Probation Officer for their recommendation of a 2-year Probationary sentence. Our request for just one year is made since he has already served over a year on Pre-trial Services and has been fully compliant.

300 Old Country Road
Suite 341
Mineola, New York 11501

Telephone (516) 248-3520
Facsimile (516) 248-3522
www.larussoandconway.com

## II.  **DISCUSSION**

As the Court is aware, United States v. Booker, 543 U.S. 220 (2005) restored District Courts' ability to fashion a sentence tailored to the individual circumstances of the case by requiring Courts to consider all the factors set forth in Title 18, U.S.C Section 3553(a). Indeed, under Title 18 U.S.C. §3553(a) courts are *required* to sentence below the range if such a sentence would be sufficient to achieve the purpose of punishment. Because the sentencing guidelines are merely advisory in the wake of Booker the Court may consider all the factors set forth in 18 U.S.C. § 3553(a) and sentence the defendant to a term of incarceration less than the advisory guidelines.

Following up on their decision in Booker, the Supreme Court, in Gall v. United States, 552 U.S 38 (2007) and Kimbrough v. United States, 552 U.S. 85 (2007), effectively reaffirmed the district court's broad sentencing discretion by permitting them to impose a sentence after considering "all" the §3553(a) factors, with the Guidelines being only one such consideration. United States v. Jones, 415 F.3d 256 (2d Cir. 2005). Any attempt to give special weight to the Guideline ranges would be contrary to Booker which ruled the Guidelines advisory.

The sentencing guidelines are only the "starting-point and the initial benchmark." Kimbrough v. United States, 552 U.S. 85 (2007) (citing, Gall v. United States, 552 U.S. 38 (2007). Moreover, the Court "may not presume that the Guideline range is reasonable." Gall v. United States, 552 U.S. 38 (2007). Nor should the sentencing court presume a non-guideline sentence "unreasonable." United States v. Jones, 415 F.3d at 256 (2d Cir. 2005); citing, Irizarry v. United States, 553 U.S. 708 (2008).

Rather, the sentencing Court must make an individualized assessment based upon the facts presented after full consideration of all the § 3553(a) factors. Gall, 552 U.S. 38 (2007). The Court may, "in the particular case [determine that] a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." Kimbrough v. United States, 552 U.S. 85 (2007) (citing, 18 U.S.C. § 3553(a)) The "greater than necessary" language of § 3553(a) includes the need for a sentence to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." The Supreme Court recognized that a prison sentence may not promote respect for the law if it appears unduly harsh after consideration of all the factors of a case. Gall v. United States, 552 U.S. 38 (2007).

The Second Circuit, considering these Supreme Court holdings has emphasized that "while a sentencing Court is statutorily obligated to give fair consideration to the guideline before imposing sentence, in the end, it must make an individualized assessment of the sentence warranted by Section 3553(a) based on facts presented." United States v. Jones, 415 F.3d.256, (2nd Cir.2008) (quoting Gall, supra at 597). "Accordingly, non-guideline sentences are not viewed with 'inherent suspicion' nor are they subject to a higher standard of review than abuse of discretion." Among the factors in 18 U.S.C. § 3553 are (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed to (A) reflect

the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, and (C) to protect the public from further crimes of the defendant. In addition to the factors set forth in 18 U.S.C. Section 3553, 18 U.S.C. § 3661 provides that "no limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court may receive for the purpose of imposing an appropriate sentence."

Based upon the "individualized assessment" of the facts presented herein and after consideration of all the factors detailed in § 3553(a), we respectfully submit that a probationary sentence is an appropriate and reasonable sentence for the defendant Andrew Parker.

Andrew has certainly had an interesting life with some twists and turns. Andrew is currently 32 years old and he was raised in a strict catholic middle-class family in Hartford, Connecticut. He was one of four children and was an average student growing up. He left Connecticut to attend college at Hofstra University here in Long Island, New York. Unfortunately, away from home and the strict guidance of his parents, Andrew fell in with a bad crowd. In 2006, he was arrested, convicted, and served three years in prison. However, after his release, Andrew was able to secure employment and soon thereafter start his own business. With hard work he has become an incredibly successful businessman and is currently in charge of three different companies that employs numerous men and woman. In addition, he has also found his soulmate whom he married in 2014. Together they have 2 children, ages 4 and 2 and Andrew has become a stepdad to his wife's two previous children who are 12 and 15, respectively. Unfortunately, out of a combination of stupidity and dumb loyalty, Andrew finds himself back in the criminal justice system. As we will set forth later in this memorandum, we ask the Court to take into consideration Andrew's success after serving his time, his current family situation, the reasons why he got involved and the relatively minor role he played herein, and lastly his assistance rendered to the government.

Andrew writes to the Court in Exhibit One. In his letter he reiterates that the most important thing in his life are his wife and children. He acknowledges the foolish mistake he has made and is ashamed and embarrassed by his conduct. He is completely remorseful for his actions and humbly asks the Court to not judge me solely on this act but on all the other factors in my life. He finishes by asking the Court to please consider the impact on his family and employees "who depend on me and to whom I miss so dearly". Andrew is a good person who made a very bad choice. It is very unlikely that he will ever commit any additional crimes. A sentence of Probation is more than enough to ensure that Andrew does not repeat his criminal behavior.

Andrew certainly poses "no" risk to the public, and the risk of recidivism is virtually non-existent. A lenient sentence below the recommended guideline range is warranted given that there is no need to protect the public from further criminal conduct of the defendant or to deter future crimes. § 3553(a) (2) (B) and (C). See also, United States v. Carmona-Rodriguez, No. 04 Cr. 667(RWS), 2005 WL 840464, *5 (S.D.N.Y.

3

April 11, 2005)(below guidelines sentence imposed after considering the low probability of recidivism); Simon v. United States, 361 F. Supp. 2d 35, 48 (E.D.N.Y 2005); United States v. Hernandez, No. 03 Cr. 1257 (RWS), 2005 WL 1242344, *5 (S.D.N.Y. May 24, 2005). Andrew presents no danger to the public, now or in the future. A substantially reduced sentence does not mean Andrew has or will escape punishment. As the Supreme Court noted in Gall, probation and/or supervised release also amounts to a "substantial restriction of freedom." 128 S.Ct. at 595. As one District Judge observed in a sentencing hearing conducted shortly after the Supreme Court's decision:

> Gall recognized for the very first time in a very long time that probation is not nothing, that there are substantial restrictions on an individual's freedom in probation, that we can structure a probationary sentence that meets all the purposes of sentencing, and that is entirely appropriate. This way one of the things that the guidelines ignored, and the guidelines dramatically changed from pre-guideline practice and which the Supreme Court is essentially saying we can now look at again.

United States v. Ramos, 04-10275-NG (D.Mass. 2008); See also Gall, 128 S.Ct. at 602 emphasizing that section 3553(a) directs the Judge to consider sentences other than imprisonment.

Therefore, we respectfully submit that application of those factors to this case warrants a sentence of Probation.

### III.   FACTORS FAVORING A SENTENCE BELOW ADVISORY RANGE

(a) Personal Characteristics and Family Circumstances:

Andrew grew up in Connecticut as one of four children born to his parents. He was raised in a strict middle-class catholic upbringing and has a great relationship with his siblings and his parents. Andrew was an average student growing up. After completing high school, Andrew attended Hofstra University in Nassau County. Living on campus and away from his parents, Andrew began to hang out with the wrong crowd. After being discharged from the school, Andrew got his own apartment in Nassau County. As an immature nineteen-year-old, Andrew allowed a friend to take a firearm from his apartment. Although Andrew knew that his friend was up to no good, he did not know what his friend had planned to do. Unfortunately, his friend committed a robbery with the weapon and when he did, he returned to Andrew's apartment where Andrew helped him (unsuccessfully) to dispose of the clothes and weapon. Andrew was subsequently charged as an accomplice in that case and, after a trial resulting in a hung jury, he plead guilty and was sentenced to three years imprisonment. After serving almost three full years as a young man in various Upstate New York Correctional Facilities, Andrew was released and pledged to never go back.

Upon his release Andrew secured a job as a telemarketer from a company headquartered in New Hyde Park, New York. He earned $8.00 an hour and was a model employee. In February 2011, Andrew and a partner decided to open their own business. At that time, they created Last Chance Funding ("LCF") and the two of them (no employees) worked out of a basement apartment belonging to his partner. They began to build up the business and in 2013, they rented a one room office in West Hempstead, New York. The business began to grow, and Andrew subsequently bought out his partner and became the sole owner of LCF. Based solely on his own hard work and (Andrew has no partners, and only recently did he bring his brothers on as employees) amazing work ethic, Andrew began to grow the business exponentially. In approximately 2016, he had ten employees and took over most of the first floor of the building he was in. He continues to grow at a very rapid pace and today he has forty employees and has outgrown the space he is in.[2] His company receives in excess of two hundred funding requests a day from small businesses all over the country. The request ranged from as little as $15,000 with the largest funding request he has fulfilled topping out at $650,000. In 2018, the business grossed somewhere in the 12-15 million-dollar range. Andrew has filed both personal and business tax returns for every year since 2011. Exhibit Two is a letter from Andrew Feldman, who serves as General Counsel for Andrew's business. Andrew writes that he has had the pleasure of being by Andrew's side for the past three years. He finds Andrew to be a remarkable leader and executive. He marvels how in just a short time he has taken the business from twelve employees to fifty. That expansion is attributable to Andrew's stewardship and dedication to his enterprise and his employees. Based on his leadership, the company is a dynamic and generous company, now engaged in several charitable initiatives.

In addition to LCF, Andrew has also recently opened two additional funding businesses. I Capital Funding operates out of the same location as LCF and currently has 6 employees. Andrew recently hired his brother, who currently runs the day to day operations, with Andrew right there to assist if necessary. The second business is Kef Capital, and is in Pompano Beach, Florida. Currently that operation has 14 employees and is managed from New York by Andrew's brother, with his help when needed. As if that is not enough to handle, Andrew has recently invested in a Mental Health/Substance Abuse Rehabilitation Facility in Florida. The facility, which is part of a chain of facilities was a client of LCF but defaulted on their obligations. Andrew and some others are now in the process of reopening the facility which will contain 52 beds for patients in that community. This facility currently has 29 employees and will grow to approximately 70 employees once all licenses have passed final approval and patients are at the facility.

Based on the success he has had in the past few years Andrew has become involved in the Hempstead Long Island, community that houses LCF. Andrew donates $5,000 yearly to the coalition for homeless children and donates $5,000 annually for a party for disabled children in the community. This past year he hired a Community

---

[2] At the time of his arrest he was exploring the prospects of moving to another location. He was looking to either rent or purchase space to allow his business to grow. Since his arrest he has put those plans on hold pending a resolution of this matter.

5

Outreach Coordinator to help him and the business identify community projects that he can get involved in.

Based on the success he has had in the past few years Andrew has became involved in various charitable endeavors. In partnership with the Coalition for the Homeless in NYC, he has sponsored monthly food trucks that distribute food to the homeless through NYC. He also sponsors an annual holiday party for homeless children. In furtherance of his goals towards helping disadvantaged children, he also sponsored a holiday party for children with St Mary's Hospital for Children.

Spurred by economic damage being done by the COVID crisis, in recent months Andrew has supported a number of food banks located around the country in support of his believe that no one in America should go hungry and no parent should have to worry about having enough food to feed their children. See Exhibit Three which includes acknowledgment of his contributions.

Personally, Andrew, in 2014, (December 24 to be exact) married his current wife and they have been blessed with two daughters. The girls are 4 and 2 years old. In addition, his wife has two children from her first marriage that Andrew treats as his own. He is the stepfather to a twelve-year old boy and a fifteen-year old daughter. Their biological father sees them every so often but does not provide any financial support to them or his ex-wife. Andrew supports his stepdaughter financially, so she can attend a Catholic high school in furtherance of her education and religious beliefs. They all reside together in a home they purchased in Flushing, New York that currently has a large mortgage that Andrew can afford based upon his business. His wife is a stay at home mom (raising four children while Andrew works 60-70 hours a week is extremely difficult and would be impossible without Andrew). The children are very close to Andrew and they do travel together often.[3] Unfortunately, Andrew's wife was just recently diagnosed with a mass on her thyroid. She has a family history of thyroid cancer, her grandmother died from it. It is too early at this stage to determine if the mass is cancerous, but she is having a biopsy soon. This is quite upsetting and unsettling to both Andrew and his wife. At this time, they have not disclosed this to their children.

Attached hereto is Exhibit Four, which is a letter from Andrew's wife Maria. She writes a very poignant letter in which she expresses dismay for his actions and the steps she has taken to make sure Andrew understands that this can never happen again. She goes on to describe what a wonderful husband and father he is. While they have two children together, she talks about how Andrew raises her two prior children like they were his own. Not only does he provide financially, but he is fully engaged in their school and outside activities. She talks about the consequences this has had on their relationship and how it impacted their respective families, including his parents and their health issues. Lastly, she talks about her concern for her health in that she has been

---

[3] Even though his bail restrictions limited travel, the Court, with the approval of the US Attorney's Office and Pre-Trial Services allowed them to take a pre-paid vacation in Cancun right after his arrest, and more recently allowed them to travel to Mexico for Thanksgiving and to Portland to see his wife's family for Christmas. Lastly, the family just took a short vacation to their time-share in Cancun.

6

advised she has a mass on her thyroid. With a history of family illness, she is extremely concerned about the future. She humbly asks the Court to consider all of the above when deciding Andrew's sentence.

Lastly, Andrews parents are also beginning to have some health-related issues. His father suffers from hypertension and has begun showing signs of cardiac problems that led to the death of his grandfather and have forced his two uncles to take early retirement. Despite a vigorous exercise regime and medication, the doctors have informed him that his condition is not improving and is expected to continue to digress as he gets older. Andrew's mother suffers from a myriad of conditions over the past few years. She suffers with diabetes which causes neuropathy in her feet which is extremely painful. She has also begun to have diminished eyesight and unfortunately will be rendered blind by the disease. This, combined with a life-long inner ear condition, makes moving around difficult. She has also been diagnosed with Fibromyalgia and after a recent flare up, she was bed-ridden for 6 weeks. It is now essential that his parents move to a home with one-level. They need to make numerous repairs to their current home for it to be placed on the market. His mom is retired, thus, they will need financial help from Andrew to do so. The plan is to have them move closer to Andrew, or one of his brothers, so they can take care of them in the coming years. Exhibit Five is a letter submitted to the Court from Jann and Donald Parker, Andrew's parents. While acknowledging his wrongdoing, the letter focuses on what Andrew has done right. They talk about his business and how he has incorporated his brothers into that. His dedication to his employees, but most importantly Andrew's dedication to his family. They talk about his children and stepchildren and the devotion he has to them and his wife. Lastly, they inform the Court about how Andrew assists them now that they are getting older and have health issues. His mom writes how they are becoming more dependent on Andrew both financially and physically and, without his support, they are not sure what they would do.

Lastly, Andrew's brother Jeffrey writes to the Court in Exhibit Six. Jeffrey acknowledges the crime his brother committed and the need for punishment. However, he wants the Court to know that he is a good man who is an amazing family man and business owner. He writes how dedicated Andrew is to his family and his business. He calls his work ethic inspirational. However, most importantly he writes about a time he was lost due to a close friend's death and it was Andrew and his family that took him in and took care of him. He also writes about Andrew's generosity and his willingness to help others. In fact, he writes that he is too willing to help others and that is how he got into this trouble. Lastly, he talks about their parents getting older and having health issues and how the entire family counts on Andrew.

Although Andrew is no stranger to the criminal justice system, it is respectfully submitted that Andrew has become an accomplished businessman and the action herein was that of foolish loyalty. While not underestimating the serious of the offense, we believe the minor role that Andrew played herein is a major factor that we ask the Court to take into consideration herein. While the complaint filed in this case speaks for itself, it is clear that Andrew had no involvement in this case until he received a call from a

"friend."[4] There is no excuse for Andrew getting involved in this case except for his unique relationship with this individual and Andrew's blind loyalty to help him. In that respect, Andrew's participation lasted all of three days and consisted of two/three phone calls wherein he arranged for his friend to meet with someone who could possibly help him in his endeavors. Andrew had no other inactions and once he put the parties in touch, he had no other involvement. This is verified by the telephone records and the surveillances the agents conducted on him. While this certainly does not excuse his behavior and actions, it does give a little better perspective of how he got involved and the limited role he played. In fact, as the agents have verified, Andrew had no additional contact with anyone else in this case and their surveillances showed that Andrew works a minimum of 12 hours a day six days a week and does very little other than work and go home to his family. Even on the day of his arrest agents waited outside his business for hours until he finally left the office after 8pm.

It is respectfully submitted that Andrew made a stupid decision in a misguided effort to help someone he felt a sense of loyalty to base upon their past. His role was extremely limited and he himself had no personal or financial interest in whatever transpired. While one can argue the stupidity of his actions, we respectfully submit that based upon his extremely successful career wherein he employs numerous people, plus his family and young children, that a probationary sentence is reasonable and warranted.

## CONCLUSION

Andrew is truly remorseful for his criminal conduct. He realizes he made a foolish decision to help someone he should not have. He hopes the Court considers his life, and balances the good he has done, and not just the conduct he has plead guilty too. He begs the Court to provide him another opportunity at a law-abiding and community-centered life free from any further criminal activity. We respectfully submit that a sentence to a Probationary term of one year is sufficient punishment herein.

Respectfully Submitted,

Joseph R. Conway, Esq.

cc: AUSA Sarah Mortazavi
    USPO Jalessa Harris

---

[4] Andrew has a unique relationship with this individual as they did time together back in 2008/09 or so. They have remained in contact over the years, but this was the first time this individual turned to Andrew for any assistance. Andrew has since provided all the information he has regarding this individual including his phone number and address. Additionally, he has agreed to and has met with this individual to assist agents in gathering information on him that will eventually lead to his arrest.

8